UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| GALVOTEC ALLOYS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:13-CV-664 |
| | § | |
| GAUS ANODES INTERNATIONAL, | § | |
| LLC, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON LIABILITY**

I.     **Factual and Procedural Background**

On December 19, 2013, Plaintiff Galvotec Alloys, Inc. filed its Original Complaint

against its competitor in the sacrificial anode business, Defendant GaUS Anodes International,

LLC, alleging that Defendant's use of two of Plaintiff's federally registered trademarks,

"Galvotec" and "GA," constitutes trademark infringement under § 1114(1) of the federal

Lanham Act and Texas common law, unfair competition under § 1125(a)(1)(A) of the Act and

Texas common law, and false advertising under § 1125(a)(1)(B) of the Act.   (Dkt. No. 1).

Simultaneously, Plaintiff moved for a preliminary injunction against Defendant's use of

Plaintiff's trademarks.  (Dkt. No. 2).  After holding an evidentiary hearing on the motion on June

20, 2014, the Court set the case for an expedited trial on issues of liability only, and in the

interim enjoined Defendant "from advertising or promoting its products by claiming that

Defendant [ ] and/or Juan Antonio Galvan founded, sold, and/or owned 'Galvotec.'" (Dkt. Nos.

36, 37).   The Court did not enjoin Defendant's use of the "GA" trademark, finding that

Plaintiff's delay in requesting this relief counseled against a finding of irreparable injury to

Plaintiff in the absence of an injunction.  (Dkt. No. 37).  On July 10, 2014, the Court granted

Plaintiff's unopposed motion to amend its complaint to add federal and state-law causes of action for trademark dilution and state-law claims for unjust enrichment, business disparagement, product disparagement, and defamation. (Dkt. Nos. 40-42). On July 30, 2014, the Court granted Defendant's unopposed motion to file an answer to the amended complaint. (Dkt. Nos. 45-47).[1] On September 11, 2014, the case proceeded to a two-day bench trial on issues of liability. Pursuant to Federal Rule of Civil Procedure 52(a), after hearing testimony and reviewing all of the evidence of record, the Court makes the following findings of fact and conclusions of law.

## II. Findings of Fact

## A. Company Formation and History

## 1. Mexican Companies

a. "Grupo Falmex Galvotec" is a trade name once used for a group of Mexican companies owned by the Galvan family, including brothers Ramon Galvan, Luis Miguel Galvan, and Juan Antonio Galvan.

b. One of the companies in that group, Tecnologia Galvanica, S.A. de C.V. ("Tecnologia Galvanica"), was founded in Mexico in or around 1983 for the purpose of developing sacrificial anodes.

## 2. Plaintiff Galvotec Alloys, Inc.

a. Plaintiff is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 6712 South 36th Street, McAllen, Texas 78503.

b. Plaintiff is a worldwide leader in the design, manufacture, and sale of sacrificial anodes used for corrosion protection, and is the leading company in the U.S.-based sacrificial anode market.

---

[1] The Court denied Defendant's later-filed motions to amend its answer to assert counterclaims against Plaintiff. (Dkt. Nos. 64, 72, 74; 09/11/2014 Minute Entry).

c.     Plaintiff manufactures aluminum, zinc, and magnesium sacrificial anodes.

d.     Plaintiff was founded in Texas in April 1984.

e.     Rogelio Garza and brothers Ramon Galvan and Luis Miguel Galvan were Plaintiff's founding shareholders.

f.     In September 1986, Ramon Galvan and Luis Miguel Galvan sold their shares in Plaintiff to Nonferrous Metal Enterprises, Ltd.

g.     In November 1987, Nonferrous Metal Enterprises, Ltd. transferred all of its shares in Plaintiff to Rogelio Garza, who became Plaintiff's sole shareholder.

h.     Rogelio Garza is Plaintiff's President and has served in this capacity since 1984.

i.     Juan Antonio Galvan has not been a shareholder, officer, or director of Plaintiff at any time.

j.     Plaintiff was not founded, sold, or owned by non-entity Grupo Falmex Galvotec, by Tecnologia Galvanica, or by Juan Antonio Galvan.

**3.     Defendant GaUS Anodes International, LLC**

a.     Defendant is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business at 6425 Cunningham Road, Houston, Texas 77041.

b.     Defendant designs, manufactures, and sells sacrificial anodes for corrosion protection, and is Plaintiff's main competitor in the U.S.-based sacrificial anode market.

c.     Defendant manufactures aluminum and zinc anodes, but not magnesium anodes.

d.     Defendant was founded in Texas in June 2005 as "A G Anodes LLC."

e.     Defendant was founded by Juan Antonio Galvan, who serves as its Chief Executive Officer ("CEO").

f.   In August 2005, Defendant changed its name to "GAUS ANODES INTERNATIONAL LLC."

g.   Defendant began operations in 2006.

**B.   "Galvotec" Trademark**

**1.   Use and Registration by Plaintiff**

a.   Since its founding in 1984, Plaintiff has used "Galvotec" to identify and advertise its company and products.

b.   Plaintiff is the owner of the trademark "GALVOTEC" for "anodes," registered on July 11, 2006 with the U.S. Patent and Trademark Office (registration number 3,114,292).

c.   The trademark "consists of standard characters without claim to any particular font, style, size, or color."

d.   The trademark is featured on Plaintiff's website and in its advertising materials and other company documents, and is displayed on products sold to customers.

**2.   Use by Defendant**

a.   As late as December 18, 2013, a page on Defendant's website labeled "Our History" ("history page") placed the following events on a timeline: 1985—"Founded Galvotec"; 1993—"Sold Galvotec to focus on development of new alloy"; and 2008—"Open[ed] new facility in the United States energy corridor to focus on the Americas."

b.   Defendant's presentations to potential customers have included the statement that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned "Galvotec."

c.   Defendant, through Juan Antonio Galvan and its employees, has stated in correspondence and conversations with potential customers that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned  "Galvotec."

**C.      "GA" Trademark**

**1.      Use and Registration by Plaintiff**

a.      In or around 1996, Plaintiff developed the following company logo:



b.      The "GA" in the logo is an abbreviation for "Galvotec Alloys."

c.      At least since 1996, Plaintiff has used the stylized logo (sometimes using only the stylized "GA") and the non-stylized letters "GA" to identify and advertise its company and products.[2]

d.      Plaintiff is the owner of the trademark "GA" for "sacrificial anodes used for the cathodic protection of on-shore and off-shore structures," registered on November 17, 2009 with the U.S. Patent and Trademark Office (registration number 3,710,948).

e.      The trademark "consists of standard characters without claim to any particular font, style, size, or color."

f.      The trademark is featured on Plaintiff's website and in its advertising materials and other company documents, and is displayed on products sold to customers.

g.      Plaintiff identifies its anodes with the letters "GA" followed by a number or number-letter combination.

**2.      Use by Defendant**

a.      Around the time of the founding of Defendant, Juan Antonio Galvan and his son, Luis Antonio Galvan Luna ("Tony Galvan"), agreed upon Defendant's name and Tony Galvan developed a company logo with the assistance of his architect friend and with the

---

[2]  Juan Antonio Galvan testified that he helped his brothers create a version of the "GA" logo for Plaintiff as early as 1984.

approval of his father.  Since that time, Defendant has used the following variations of the logo, as well as the non-stylized letters "GaUS," to identify and advertise its company and products:



b.    Tony Galvan testified that he intended the design of the logo to imitate the periodic table of the elements ("Ga," although not "GA," is the abbreviation for the element gallium in the periodic table),[3] and also to reflect that the letters signify "Galvan in the United States" and/or "Galvanic Anodes in the United States."[4]

c.    As late as December 18, 2013, a page on Defendant's website used the letters "GA" (both letters are capitalized but the "A" is smaller) to mark the locations of clients of Defendant, and of the Grupo Falmex Galvotec group of Mexican companies, on a map ("client map page").

**D.    Website Metatags and Internet Search Engine Results**

1.    The metatags for Defendant's website, which are used by Internet search engines to generate search results, are virtually identical to and in the same order as Plaintiff's, and include "magnesium anodes," "water heater anodes," and "extruded anodes" that Defendant does not manufacture.

---

[3]  The Court notes that "Ag," the original first two letters of Defendant's name, is also an abbreviation for an element (silver) in the periodic table.

[4]  Tony Galvan also testified that the scientific term for sacrificial anodes is galvanic anodes, but the Court notes that the parties use the term sacrificial anodes to advertise their products.

2.  Tony Galvan assisted in deciding which terms would be used for Defendant's metatags.

3.  The first result for the search term "GA anodes" in the Google, bing, and Yahoo! search engines is Defendant's website.

**E.  "Cease and Desist" Letters and Response**

1.  In a letter dated January 18, 2010 and sent to Defendant, Plaintiff through Rogelio Garza objected to Defendant's use of the "Galvotec" trademark on the history page of its website and asked Defendant to "remove or clarify the name Galvotec as soon as possible."

2.  In a letter dated March 8, 2010 and sent to Defendant, Plaintiff through counsel objected to: (i) Defendant's use of the "Galvotec" trademark on the history page of its website, in that such use "unfairly implies a connection between your company and [Plaintiff]"; (ii) Defendant's "prominent" use of the "GA" trademark "on every page of your website"; and (iii) Defendant's statements to "persons in this industry that you founded Galvotec," since "[w]hether or not you actually founded another company whose name begins with Galvotec…, your statements are unfairly implying a connection between your current company and [Plaintiff]."  Plaintiff asked Defendant to "remove all instances" of the trademarks from its website, catalog, and other advertising material, and to stop making statements that Defendant founded Galvotec.  Plaintiff did not object to Defendant "using Gaus in your company name as long as the GA or Ga do not stand out in some way from the US or us (as they currently do on your website)."

3.  Sometime after December 18, 2013, Defendant changed the history page of its website as requested.

4.  After receipt of the letters, Defendant through its employees has stated to potential

customers that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned "Galvotec."[5]

5. Sometime after December 18, 2013, Defendant removed the letters "GA" from the client map page of its website.

6. After receipt of the letters, Defendant has continued to separate "Ga" and "US" in its logo, and to use the logo and "GaUS" to identify and advertise its company and products.

7. On June 19, 2014, Defendant filed a "Petition to Cancel" with the U.S. Patent and Trademark Office, seeking to cancel Plaintiff's "GA" trademark. The petition alleges that Defendant "is damaged by [Plaintiff's] registration because the registration creates a likelihood of confusion with [Defendant's] own common law marks and exposes [Defendant] to allegations of trademark infringement."

## F. Customer Confusion and Plaintiff's Response

1. Plaintiff's and Defendant's customers consist mostly of companies in the oil and gas industries who use sacrificial anodes for corrosion protection of onshore and offshore structures. The parties' customer contacts generally are project engineers and purchasing agents of these companies.

2. Prior to purchasing sacrificial anodes from either party, a customer typically submits a request for quotation ("RFQ"), the party submits a bid, and the party receiving the bid manufactures the anodes according to the customer's specifications.

3. The parties directly compete for customers by advertising in the same trade publications and at the same trade shows, in print materials, on the Internet, and in person. The parties

---

[5] On June 26, 2014, the Court enjoined Defendant from continuing to make such statements. (Dkt. No. 37). No evidence exists that Defendant has violated the Court's order.

also directly compete in the bidding process.

4. Although the parties have many repeat customers, customer personnel and contacts change and not all contacts are experts in purchasing sacrificial anodes.

5. Defendant has received emails from potential customer contacts and from individuals seeking help and information on anodes, including magnesium anodes that Defendant does not manufacture.

6. Some of the parties' customers/customer contacts have attempted to pick up anodes ordered from Defendant from Plaintiff's facility, requested "Galvotec" anodes from Defendant, or believed (or at least wondered whether) Plaintiff and Defendant are or were affiliated entities.

7. In a letter dated April 15, 2011 and sent to customers and potential customers, Plaintiff through Rogelio Garza informed the recipients that "one of our competitors is claiming that they are a spin-off or are otherwise related to [Plaintiff]," and that this claim was false.

**III. Count 1: Trademark Infringement under the Lanham Act (15 U.S.C. § 1114(1)); Count 2: Unfair Competition under the Lanham Act (15 U.S.C. § 1125(a)(1)(A)); Count 4: Common Law Unfair Competition; and Count 5: Common Law Trademark Infringement**

**A. Overview of Applicable Law**

Section 1114(1) of the Lanham Act prohibits the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation" of a registered trademark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Section 1125(a)(1)(A) similarly prohibits unfair competition with respect to registered *and* unregistered trademarks. *See id.* § 1125(a)(1)(A); *Amazing Spaces, Inc. v. Metro*

*Mini Storage*, 608 F.3d 225, 235 n.8 (5th Cir. 2010).[6]  To prevail on either claim, a plaintiff must (1) establish that it has a legally protectable mark and (2) show infringement by demonstrating a likelihood of confusion.  *Amazing Spaces*, 608 F.3d at 235-36; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980) (claims under §§ 1114(1) and 1125(a)(1)(A) both require showing of likelihood of confusion).  "A trademark infringement and unfair competition action under Texas common law presents essentially no difference in issues than those under federal trademark infringement actions."  *Amazing Spaces*, 608 F.3d at 235 n.7 (quoting *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex.App.-Austin 2001, pet. denied)) (internal quotations omitted).  Thus, the analysis with respect to the federal claims is dispositive of the claims brought under Texas law.  *Id.*

## 1.      Legally Protectable Mark

Federal registration of a mark constitutes *prima facie* evidence of the mark's validity.  15 U.S.C. § 1115(a); *id.* at 237.  A defendant may rebut this presumption by showing that the mark is not inherently distinctive.  *Amazing Spaces*, 608 F.3d at 237.  "[A] mark is inherently distinctive if its intrinsic nature serves to identify a particular source."  *Id.* at 240 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000)).  Marks are often classified in the following categories of generally increasing distinctiveness:

*Generic*: refers to an entire class of products and does not distinguish a product at all,

---

[6]  Section 1125(a)(1)(A) provides in full:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person….

15 U.S.C. § 1125(a)(1)(A).

such as "airplane" or "computer."

*Descriptive*: describes features or characteristics of a product, such as "All Bran" or "Holiday Inn."

*Suggestive*: suggests, rather than describes, features or characteristics of a product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the product, such as "Business Week" for a business periodical or "Coppertone" for sun tanning products.

*Arbitrary*: uses a common word in an unfamiliar way, such as "Apple" for computers or "Ivory" for soap.[7]

*Fanciful*: is not a word at all, but is invented solely for the purpose of identifying a particular product, such as "Kodak" for film or "Exxon" for fuel.

*Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460 n.7 (5th Cir. 2003); *id.* at 240 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (2000)), 241 (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786 (5th Cir. 1983)). "Marks that are suggestive, arbitrary, or fanciful, 'because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection.'" *Amazing Spaces*, 608 F.3d at 241 (quoting *Two Pesos*, 505 U.S. at 768). "In contrast, descriptive marks may be protected only upon a showing of acquired or secondary meaning, while generic marks may never acquire secondary meaning and are categorically excluded from protection." *Id.* (citing *Two Pesos*, 505 U.S. at 768-69).

2.      **Likelihood of Confusion**

In determining whether a likelihood of confusion exists, courts consider the non-

---

[7]  A combination of letters also has been held to constitute an arbitrary mark.  In *W-K-M Div. of Joy Mfg. Co. v. WK Industries*, 1987 WL 15500 (S.D.Tex. Mar. 13, 1987), cited by Plaintiff and analogous to the present case in multiple respects, the plaintiff owned a federal trademark registration on the mark "WKM" "as used on gate valves and other products." *Id.* at *1.  The district court determined that the WKM mark was arbitrary "since it has no apparent relation to gate valves," and rejected the defendant's suggestion that the mark was not strong simply because it consisted of a combination of letters.  *Id.*

exhaustive list of these "digits of confusion": (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Id.* "Actual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998). "Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." *Id.* (quoting 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION 23:6 (4th ed. 1997)).

In the largely analogous case of *W-K-M Div. of Joy Mfg. Co. v. WK Industries*, *supra*, a trademark infringement action between two manufacturers of gate valves commonly used in the oilfield and pipeline industries, the plaintiff W-K-M Division of Joy Manufacturing Company owned a federal trademark registration on the mark "WKM" "as used on gate valves and other products." *W-K-M Div. of Joy Mfg.*, 1987 WL 15500 at *1. After eight years as the plaintiff's general manager, Willard Kemp resigned and formed WK Industries to manufacture, sell, and service gate valves in direct competition with the plaintiff. *Id.* The defendant company used "WK" and two logos based on those initials in its advertising. *Id.* In determining that the requisite likelihood of confusion existed, the district court made the following findings with respect to the digits of confusion:

(1)    The WKM trademark was arbitrary since it was a combination of letters with "no apparent relation to gate valves";

(2)    WK's distinguishing logo design did not eliminate the likelihood of confusion, as the initials in the logo were still the first two letters found in the WKM trademark and "any customer who remembered the company's initials, but failed to attach legal significance to the design, would be misled";

(3)    Both companies sold gate valves;

(4), (5), & (8)  Both companies advertised in the same journals and sold their valves in direct competition, and the alleged sophistication of customers did not negate the likelihood of confusion since "[a] confusing trademark would still be likely to create confusion in both the original and secondary market, even if the confusion could be overcome easily by a thorough customer";

(6)    Willard Kemp could have marked the company with his own name without using the initials WK, and in fact he selected those initials "with full knowledge that the initials might be confused with WKM"; and

(7)    The statement of one customer contact indicated the potential for confusion, as the contact was "interested and curious as to any connection" between WK and WKM.

*Id.* at *1-2.

**B.    Conclusions of Law**

**1.    "Galvotec" Trademark**

**a.    Legally Protectable Mark**

Plaintiff's federal registration of "Galvotec" for "anodes" constitutes *prima facie* evidence of the validity of the mark in this context. Defendant has failed to rebut the presumption that "Galvotec" is a valid mark because: (i) it was incorporated into the name of U.S. corporation Plaintiff in 1984, and since that time has been used to identify the source of Plaintiff's products rather than the features or characteristics of those products; and (ii) at most, "Galvotec" is suggestive of "galvanic" technology/anodes. Therefore, "Galvotec" for "anodes" is an inherently distinctive mark entitled to protection.

**b.     Likelihood of Confusion**

The Court makes the following findings with respect to the "digits of confusion":

(1)     At most, the "Galvotec" trademark is suggestive of "galvanic" technology/anodes and is an inherently distinctive mark entitled to protection;

(2)     The mark used by Defendant is the same;

(3)     Both parties design, manufacture, and sell aluminum and zinc sacrificial anodes;

(4) & (5)  The parties directly compete for customers by advertising in the same trade publications and at the same trade shows, in print materials, on the Internet, and in person;

(6)     By stating on the history page of its website, in presentations to potential customers, and in correspondence and conversations with potential customers, that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned "Galvotec," Defendant intended that customers infer an affiliation between Defendant and Plaintiff (rather than, or at least in addition to, the Grupo Falmex Galvotec group of Mexican companies);[8]

(7)     Some of the parties' customers/customer contacts have attempted to pick up anodes ordered from Defendant from Plaintiff's facility, requested "Galvotec" anodes from Defendant, or believed (or at least wondered whether) Plaintiff and Defendant are or were affiliated entities; and

(8)     Although the bidding process requires the exercise of a significant degree of care in order to *complete* a purchase of anodes from either party, this degree of care does not negate the potential for confusion among customers (whose personnel and contacts change) and potential customers at some point during the initial inquiry or purchasing process.

The Court finds that all of the digits of confusion are met, and that Defendant has infringed on the "Galvotec" trademark by creating a likelihood of confusion among customers and potential customers.[9]

---

[8]  The Court derives its finding of intent from the nature of Defendant's use of the "Galvotec" mark, the Court's assessment of the testimony of Juan Antonio Galvan and Tony Galvan, and evidence (such as Defendant's use of the website metatags) that Defendant intended to directly compete with Plaintiff.

[9]  The Court recognizes that by letter dated April 15, 2011, Rogelio Garza informed customers and potential customers that "one of our competitors is claiming that they are a spin-off or are otherwise related to [Plaintiff]," and that this claim was false.  This letter did not dispel the potential for confusion

2.      **"GA" Trademark**

a.      **Legally Protectable Mark**

Plaintiff's' federal registration of "GA" for "sacrificial anodes used for the cathodic protection of on-shore and off-shore structures" constitutes *prima facie* evidence of the validity of the mark in this context. Defendant has failed to rebut the presumption that "GA" is a valid mark because: (i) "GA" is an abbreviation for Plaintiff's company name, Galvotec Alloys, and at least since 1996 has been used to identify the source of Plaintiff's products rather than the features or characteristics of those products; and (ii) the "GA" combination of letters is an arbitrary mark that does not suggest a feature or characteristic of Plaintiff's anode products.[10] Therefore, "GA" for "sacrificial anodes used for the cathodic protection of on-shore and off-shore structures" is an inherently distinctive mark entitled to protection.

b.      **Likelihood of Confusion**

The Court makes the following findings with respect to the "digits of confusion":

(1)      The "GA" trademark is arbitrary, and therefore an inherently distinctive mark entitled to protection, since it is a combination of letters that does not suggest a feature or characteristic of Plaintiff's anode products;

(2)      Defendant's use of "GA" and "Ga" followed by "US" in its logo design and company name does not eliminate the likelihood of confusion with Plaintiff's "GA" trademark, as the logo design separates "GA"/"Ga" (and encapsulates it in a square, much like Plaintiff's logo design encapsulates "GA" in a trapezoidal figure) from "US," and Plaintiff's use of the non-stylized letters "GaUS" also creates a visual separation. Further, in the single instance of the client map page of Defendant's website, Defendant used Plaintiff's "GA" trademark without the addition of the letters "US";

(3)      Both parties design, manufacture, and sell aluminum and zinc sacrificial anodes;

(4) & (5)      The parties directly compete for customers by advertising in the same trade

---

as to whether the parties were affiliated, given that customer personnel and contacts change and the letter could not have reached all potential customers of both parties.

[10]      Even assuming, as Defendant argues, that "GA" also could stand for "galvanic anodes," the Court finds that "GA" is merely suggestive of this meaning.

publications and at the same trade shows, in print materials, on the Internet, and in person;

(6)     Juan Antonio Galvan could have marked the company with his own name without using "GA," and in fact agreed upon a name for his company and approved the logo with full knowledge that Defendant's use of "GA" might create confusion with Plaintiff's trademark;[11]

(7)     Some of the parties' customers/customer contacts have attempted to pick up anodes ordered from Defendant from Plaintiff's facility, requested "Galvotec" anodes from Defendant, or believed (or at least wondered whether) Plaintiff and Defendant are or were affiliated entities; and

(8)     Although the bidding process requires the exercise of a significant degree of care in order to complete a purchase of anodes from either party, this degree of care does not negate the potential for confusion among customers (whose personnel and contacts change) and potential customers at some point during the initial inquiry or purchasing process.

The Court finds that all of the digits of confusion are met, and that Defendant has infringed on the "GA" trademark by creating a likelihood of confusion among customers and potential customers.[12]

## IV.     Count 3: Trademark Dilution under the Trademark Dilution Revision Act (15 U.S.C. § 1125(c)) and Count 11: Trademark Dilution under TEX. BUS. & COM. CODE 16.103[13]

### A.     Overview of Applicable Law

In relevant part, § 1125(c) of the Trademark Dilution Revision Act ("TDRA") provides that "[s]ubject to the principles of equity, the owner of a famous mark that is distinctive…shall be entitled to an injunction against…[the] use of a mark…in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or

---

[11]   The Court derives its finding of intent from the nature of Defendant's use of the "GA" mark, the Court's assessment of the testimony of Juan Antonio Galvan and Tony Galvan, and evidence (such as Defendant's use of the website metatags) that Defendant intended to directly compete with Plaintiff.

[12]   In fact, Defendant's petition to cancel Plaintiff's "GA" trademark essentially admitted to a likelihood of confusion between Plaintiff's registered trademark and Defendant's "common law marks."

[13]   Plaintiff brings its state-law cause of action under Texas Business & Commerce Code § 16.29, which has been recodified as § 16.103.

absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c). To show trademark dilution under the TDRA, a plaintiff must establish that: (1) it owns a famous and distinctive mark; (2) the defendant has commenced using the famous mark in a manner that dilutes the mark; (3) the similarity between the plaintiff's mark and the defendant's mark gives rise to an association between the marks; and (4) the association is likely to impair the distinctiveness (blurring), or harm the reputation of (tarnishment), the famous mark. *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012); *see id.* § 1125(c)(2)(B), (C). For a mark to be famous, it must be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner," 15 U.S.C. § 1125(c)(2)(A), although it need only be famous within its specific industry or market, *Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car, Co.*, 238 F.3d 378, 380 (5th Cir. 2001).

Texas's anti-dilution statute similarly entitles the owner of a famous and distinctive mark to an injunction against the commercial use of a mark if such use is likely to cause dilution of the famous mark through blurring or tarnishment. TEX. BUS. & COM. CODE § 16.103(a). Section 16.03 was "intended to make the Texas dilution standard 'substantially consistent' with federal law," and therefore the same analysis applies to both claims. *US Risk Ins. Grp., Inc. v. U.S. Risk Mgmt., LLC*, 2013 WL 4504754, at *20 n.3 (N.D. Tex. Aug. 20, 2013) (quoting Notes to TEX. BUS. & COM. CODE § 16.103).

**B.     Conclusions of Law**

Plaintiff's "Galvotec" and "GA" trademarks are famous within the U.S.-based sacrificial anode market, and for the reasons explained in § III, are inherently distinctive marks entitled to protection. By stating on the history page of its website, in presentations to potential customers,

and in correspondence and conversations with potential customers, that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned "Galvotec," Defendant has used Plaintiff's "Galvotec" mark in a manner that gives rise to an association with Plaintiff's mark, and that is likely to impair the distinctiveness of or harm the reputation of Plaintiff's mark. Further, by creating visual separation between "GA"/Ga" and "US" in its logo design and name, and by using "GA" without the addition of the letters "US" on the client map page of its website, Defendant has used Plaintiff's "GA" mark in a manner that gives rise to an association with Plaintiff's mark, and that is likely to impair the distinctiveness of or harm the reputation of Plaintiff's mark.

## V.      Count 6: Unjust Enrichment

## A.      Overview of Applicable Law

"Despite the lack of unanimity among Texas courts, one thing remains clear: even in the cases [suggesting unjust enrichment is not an independent cause of action], the courts have still allowed plaintiffs to recover based on the *theory* of unjust enrichment so long as a 'person has obtained a benefit from another by fraud, duress, or the taking of undue advantage.'" *Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc.*, 2014 WL 5040055, at *6 (W.D. Tex. Oct. 8, 2014) (quoting *Newington Ltd. v. Forrester*, 2008 WL 4908200, at *4 (N.D.Tex. Nov. 13, 2008)) (emphasis in original); *see also Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Unjust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain benefits received. *Perales v. Bank of Am.*, 2014 WL 3907793, at *3 (S.D.Tex. Aug. 11, 2014) (citing *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex.App.-Dallas 2006, no pet.)). The Fifth Circuit "has held it appropriate to award profits of an infringer pursuant to [15 U.S.C. § 1117(a)] for various purposes," among them "to remedy unjust

enrichment of the infringer." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 340 (5th

Cir. 2008).

**B.      Conclusions of Law**

Plaintiff has not identified or presented evidence of a benefit obtained by Defendant

through fraud or duress.  To the extent that Plaintiff's recovery on its trademark claims does not

account for a benefit received by Defendant through its advantageous use of Plaintiff's

trademarks in violation of the law, Plaintiff may pursue restitution under the theory of unjust

enrichment during the damages phase of this case.

**VI.      Count 7: False Advertising under the Lanham Act (15 U.S.C. § 1125(a)(1)(B))**

**A.      Overview of Applicable Law**

Section 1125(a)(1)(B) of the Lanham Act, which has been interpreted by the Fifth Circuit

as protecting against false advertising, provides in relevant part:

> Any person who, on or in connection with any goods or services…, uses in commerce
> any word, term, name, symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or false or misleading
> representation of fact, which….in commercial advertising or promotion, misrepresents
> the nature, characteristics, quality, or geographic origin of his or another person's goods,
> services, or commercial activities, shall be liable in a civil action by any person who
> believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir.

2000).  To establish a *prima facie* case of false advertising, a plaintiff must show: (1) a false or

misleading statement about a product; (2) such statement either deceived or had the capacity to

deceive a substantial segment of potential customers; (3) the deception is material, in that it is

likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce;

and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue.  *Pizza*

*Hut*, 227 F.3d at 495.  To obtain monetary damages or injunctive relief for false advertising, the

plaintiff must demonstrate that the advertisement is literally false or likely to mislead and confuse customers. *Pizza Hut*, 227 F.3d at 495. If the statement is literally false, customer deception is presumed, but if the statement is misleading, the plaintiff must also introduce evidence of the statement's impact on customers. *Id.* at 495, 497. A plaintiff seeking monetary damages for a misleading statement must prove actual deception by producing evidence of "actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled...." *Id.* at 497. A plaintiff seeking injunctive relief must show that the misleading statement "tends to deceive customers," *i.e.*, that at least "some" consumers were confused. *Id.*

**B.     Conclusions of Law**

By stating on the history page of its website, in presentations to potential customers, and in correspondence and conversations with potential customers, that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned "Galvotec," Defendant used "in commerce" and for the purpose of commercial advertising and promotion, a misleading statement about the nature, characteristics, qualities, or geographic origin of Defendant's goods or services—that is, Defendant suggested that such goods or services originated with Plaintiff (rather than, or at least in addition to, the Grupo Falmex Galvotec group of Mexican companies). Further, evidence was presented that some of the parties' customers/customer contacts have attempted to pick up anodes ordered from Defendant from Plaintiff's facility, requested "Galvotec" anodes from Defendant, or believed (or at least wondered whether) Plaintiff and Defendant are or were affiliated entities. The Court finds that this evidence shows a tendency to deceive customers, and that such deception is material because a suggested affiliation with the leading company in the U.S.-based sacrificial anode market is likely to influence consumers' purchasing decisions and to

injure Plaintiff. Since Plaintiff did not produce evidence that a substantial number of consumers were actually misled, Plaintiff is entitled to injunctive relief, but not monetary damages, on its false advertising claim.

## VII. Count 8: Business Disparagement; Count 9: Product Disparagement; and Count 10: Defamation

### A. Overview of Applicable Law

To recover for business disparagement under Texas law, a plaintiff must show that the defendant published a false and disparaging statement about the plaintiff, with malice and without privilege. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014). To maintain a defamation cause of action, a private plaintiff must prove that the defendant published a statement that was defamatory concerning the plaintiff, with negligence regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). "For a statement to be actionable in defamation, it must expressly or impliedly assert facts that are objectively verifiable." *Miranda v. Byles*, 390 S.W.3d 543, 550 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) (quoting *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 509 (Tex.App.-Tyler 2008, pet. denied)). "[S]tatements that are not verifiable as false cannot form the basis of a defamation claim." *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013).

Claims for business disparagement and defamation are similar in that they "[b]oth involve the imposition of liability for injury sustained through publications to third parties of a false statement affecting the plaintiff." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (5th Cir. 1987); *see also Waste Mgmt. of Tex.*, 434 S.W.3d at 155. The two torts differ in that business disparagement seeks to protect economic interests against pecuniary loss, whereas defamation seeks to protect reputation interests. *Id.*

**B.      Conclusions of Law**

Through its statements that that Defendant and/or Juan Antonio Galvan founded, sold, and/or owned "Galvotec," Defendant sought to capitalize on Plaintiff's reputation (rather than maliciously disparage Plaintiff) by suggesting a connection between the parties.  Therefore, these statements are not actionable as business disparagement.  Plaintiff also alleges that Defendant is liable for business and product disparagement and defamation because it has informed customers and potential customers that its product is superior to that of Plaintiff, but this statement is not objectively verifiable as false and cannot form the basis for Defendant's liability under any of these causes of action.  Finally, Plaintiff alleges that Defendant is liable for defamation because it has informed customers and potential customers that Defendant's manufacturing process and equipment lead to a better product, but these statements also are not objectively verifiable as false and cannot form the basis for Defendant's liability for defamation.

**VIII.   Affirmative Defenses**

**A.      Fair Use**

**1.      Overview of Applicable Law**

Section 1115(b)(4) of the Lanham Act provides for an affirmative defense of "fair use," defined in relevant part as the defendant's use, "otherwise than as a mark," of a term which is "descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."   15 U.S.C. § 1115(b)(4).   Thus, the defense "allows [the defendant] to use a term in good faith to describe its goods or services, but only in actions involving descriptive terms and only when the term is used in its descriptive sense rather than in its trademark sense."  *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 270-71 (5th Cir. 1999).  The doctrine of nominative fair use also allows a defendant to use a mark to describe the

markholder's goods or services for purposes of comparison. *See Smack Apparel*, 550 F.3d at 488 (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998)). In order to avail itself of this doctrine, "the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder." *Id.* at 489 (quoting same). The federal and Texas anti-dilution statutes also establish a fair use defense where a defendant uses a mark for comparative advertising or promotion and "other than as a designation of source for the [defendant's] own goods or services." *See* 15 U.S.C. § 1125(c)(3); Tex. Bus. & Com. Code § 16.103(d).

**2. Conclusions of Law**

Defendant cannot appeal to the fair use defense under § 1115(b)(4) because "Galvotec" is not a descriptive term. Although Defendant alleges that it used the term "Galvotec" to identify "the company Galvotec" and distinguish it from Defendant, such use has falsely suggested an affiliation with Plaintiff, and therefore was not done fairly and in good faith to describe Defendant's goods or services or their geographic origin, nor was it done for the purpose of comparing the parties' goods or services. Therefore, Defendant is not entitled to the affirmative defense of fair use as to Plaintiff's claims against it under the Lanham Act and under the federal and Texas anti-dilution statutes.

**B. Laches**

**1. Overview of Applicable Law**

The Lanham Act establishes no limitations period, but provides that the equitable principle of laches may be considered and applied. *See Jaso v. The Coca Cola Co.*, 435 F.App'x 346, 356 (5th Cir. 2011); 15 U.S.C. § 1609. The affirmative defense of laches has three elements: (1) delay by the plaintiff in asserting its trademark rights; (2) lack of excuse for the delay; and (3)

undue prejudice to the defendant caused by the delay. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 489-90 (5th Cir. 2008) (quoting *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 668 (5th Cir. 2000)). "A defendant who intentionally infringes a trademark with the bad faith intent to capitalize on the markholder's good will lacks the clean hands necessary to assert the equitable defense." *Id.* (citing *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150-51 & n.2 (5th Cir. 1985).

### 2.  Conclusions of Law

Defendant intentionally used Plaintiff's "Galvotec" and "GA" trademarks with the bad faith intent to capitalize on Plaintiff's good will.[14]  Therefore, Defendant lacks the clean hands necessary to assert the equitable affirmative defense of laches.

## IX.  Attorney's Fees

### 1.  Overview of Applicable Law

Section 1117(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. ¶ 1117(a).  "The prevailing party bears the burden of demonstrating the exceptional nature of the case by clear and convincing evidence." *Smack Apparel*, 550 F.3d at 491.  "An exceptional case is one where the violative acts can be characterized as malicious, fraudulent, deliberate, or willful." *Id.* (quoting *Pebble Beach*, 155 F.3d at 555).  "The necessary showing demands a 'high degree of culpability on the part of the infringer, for example bad faith or fraud.'" *Id.* (quoting *Pebble Beach*, 155 F.3d at 556).  The Fifth Circuit has cautioned that deliberate copying and even bad faith in violating the Lanham Act do not render a case *per se* exceptional; rather, courts must consider all

---

[14]  Again, the Court derives its finding of intent from the nature of Defendant's use of Plaintiff's "Galvotec" and "GA" marks, the Court's assessment of the testimony of Juan Antonio Galvan and Tony Galvan, and evidence (such as Defendant's use of the website metatags) that Defendant intended to directly compete with Plaintiff.

the facts and circumstances in making this assessment. *Id.* (finding that district court did not abuse its discretion in denying attorney's fees where it credited testimony of witness that offset other evidence of deliberate copying and bad faith, and where liability determination involved novel trademark issues).

## 2. Conclusions of Law

Clear and convincing evidence exists that Defendant's infringing use of the "Galvotec" and "GA" trademarks was deliberate and willful, and that Defendant acted with bad faith intent to capitalize on Plaintiff's good will.[15] Further, this case presents no extenuating facts or circumstances that would offset such evidence. Therefore, the Court finds that Plaintiff is entitled to an award of attorney's fees for Defendant's violations of the Lanham Act.

## X. Summary of Conclusions of Law

For the foregoing reasons, the Court concludes:

Defendant is liable to Plaintiff on Counts 1, 2, 3, 4, 5, and 7 of Plaintiff's First Amended Original Complaint;

Defendant is not entitled to the affirmative defenses raised in its First Amended Answer;

Plaintiff is entitled to an award of attorney's fees for Defendant's violations of the Lanham Act;

Plaintiff has not established Defendant's liability on Count 6 of Plaintiff's First Amended Complaint, but to the extent that Plaintiff's recovery on its trademark claims does not account for a benefit received by Defendant through its advantageous use of Plaintiff's trademarks in violation of the law, Plaintiff may pursue restitution under the theory of unjust enrichment during the damages phase of this case; and

Defendant is not liable to Plaintiff on Counts 8, 9, or 10 of Plaintiff's First Amended

---

[15] *Id.*

Complaint.

SO ORDERED this 2nd day of December, 2014, at McAllen, Texas.

Randy Crane
United States District Judge